2005 VT 58

**STATE of Vermont v. Bradford COYLE**

[878 A.2d 1062]

No. 04-098

¶ 1. May 12, 2005. Defendant appeals the Windsor District Court's conclusion that he violated a condition of his probation by failing to complete sex offender treatment. The court found that the director of the treatment program discharged defendant from the group because of his willful failure to follow the group's rule that specifically prohibits unapproved contact with defendant's victims and other minor children. Defendant claims that the trial court erred by failing to make an express finding that defendant's contact with his victim was intentional and not inadvertent. Defendant claims that, without such a finding, his termination from his sex offender treatment program in violation of his probation cannot be upheld. We conclude that the court did in fact make the re-

quired, adequately-supported findings and conclusions. Therefore, we affirm.

¶ 2. In 1997, defendant pled guilty to and was convicted of lewd and lascivious conduct with his nine year old stepdaughter J.N. He received a sentence of three to five years in prison, which was all suspended. In lieu of incarceration, the court placed defendant on supervised probation.

¶ 3. The court imposed a number of standard and special probation conditions including condition 14, which required defendant to "attend, [and] participate in sex offender treatment as directed by your probation officer." Special condition 4 elaborated on defendant's obligation under condition 14, mandating that defendant "shall attend and satisfactorily participate in sexual behavior counseling and will not be discharged without satisfactory completion all as determined by your counselor and probation officer." In addition, special condition 14 prohibited defendant from having "contact with the victim(s) in this case," including "any physical, *visual*, written or telephone contact with such persons." (Emphasis added.)

¶ 4. By April 2003, Mr. Coyle had been on probation for a period of six years. During that time, he had participated in the sex offender treatment program run by Kieran Zito. Though he had moved on to the aftercare phase of the program, an incident in February 2003, involving unsupervised contact with a minor, led Zito to impose a stricter supervision regime requiring defendant to report on his progress weekly instead of monthly. Despite defendant's relative success in the program, he did have a history of violating the group's child contact guidelines, and as a result had been warned or placed on probation several times.

¶ 5. On April 10, 2003, defendant was arrested for violating, among others, special condition 14's prohibition against all forms of contact with any of defendant's victims. J.N. complained of the contact after encountering defendant at the Price Chopper. She averred that she was getting out of her car in the Price Chopper parking lot when defendant's car pulled in diagonally across from hers. J.N. testified that defendant made eye contact with her and walked into the store directly behind her. She further stated that as she walked to the customer service desk, defendant followed her and stood directly behind her in the line. Her statement gives no indication that he made any attempt to initiate conversation or further eye contact with her once inside the store, although he did have to move out of her way as she was leaving the customer service area. When the police arrived to arrest defendant later that day, he claimed that he was oblivious to any victim contact that happened earlier that day. When he was told that it occurred at the Price Chopper, he insisted that he had not recognized any of his victims there.

¶ 6. Following defendant's arrest for the alleged contact violation, Zito sent a letter to defendant's probation officer, advising that he was terminating defendant from the treatment group. The letter states that the "basis for this termination arises from Mr. Coyle's recent unapproved contact with a minor child, it's important to note that this contact involved his victim of record." The letter goes on to recount another incident involving unsupervised contact with a minor earlier that year, and concludes with Zito's observation that "Mr. Coyle appears to be engaging in a willful pattern of disregard for his treatment guidelines prohibiting contacts with minors." Based on this notice of termination, defendant was charged with a second violation of probation, specifically condition 14's requirement that defendant participate in sex offender treatment as directed by his probation officer.

¶7. The district court held a violation of probation merits hearing on both the alleged contact and termination of treatment violations. During the hearing, the court heard testimony from Zito, J.N., and defendant. The testimony focused on two main areas: defendant's performance history in the treatment group, and the events surrounding the alleged Price Chopper contact with J.N. At the conclusion of the hearing, the court ruled that the State had met its burden by showing that defendant had been terminated from his sex offender treatment program in violation of condition 14. The court made no determination on the alleged violation of the no-contact probation condition, although it did consider whether the evidence supported Zito's conclusion that defendant violated the no-contact policies of the treatment group. The court then considered whether defendant had persuaded the court that his termination from the group was not the result of his willful conduct, but instead resulted from factors beyond his control. After recounting defendant's history of violating the treatment group's no-contact policies, the court analyzed the two incidents specifically referenced in Zito's letter of termination. The court found that defendant's assertion that he did not recognize J.N. at the Price Chopper lacked credibility. Accordingly, the court held that defendant had not met his burden of showing that his expulsion from treatment resulted from factors beyond his control because his failure to remove himself from proximity to J.N. after recognizing her was contrary to group policy and amply justified Zito's decision to terminate him.

¶8. The State bears the burden of proving probation violations by a preponderance of the evidence. *State v. Austin*, 165 Vt. 389, 398, 685 A.2d 1076, 1082 (1996). This is a mixed question of fact and law. *Id.* The court must make a factual determination of what actions the probationer took, and then an "implicit legal conclusion that certain acts constitute a violation of the probationary terms." *Id.* (quotations omitted). The State makes out its prima facie case by showing that there has been a violation of a probation condition whose requirements were known to the probationer. *Id.* If the State meets its initial burden, the probationer must show that his violation was not willful, but instead resulted from factors beyond his control and through no fault of his own. *Id.* The intent element in no-contact cases safeguards a defendant's constitutional right to due process by ensuring that a defendant's probation is not violated because of accidental or inadvertent conduct. See *Benson v. Muscari*, 172 Vt. 1, 4-5, 769 A.2d 1291, 1295 (2001) (recognizing that a probationer cannot be criminally convicted for violating an abuse prevention order containing a no-contact buffer zone around the victim unless the State can show that probationer intended to place himself within the prohibited distance from the victim); see also *State v. Bubar*, 146 Vt. 398, 405, 505 A.2d 1197, 1201-02 (1985) (noting that compliance with probation conditions "may not be put beyond the probationer's control."). For example, in *State v. Danaher*, we affirmed the trial court's conclusion that the probationer had violated the no-contact condition of his probation because circumstantial evidence supported the trial court's finding that the alleged contact incidents were "not inadvertent, but intentional." 174 Vt. 591, 594, 819 A.2d 691, 695 (2002) (mem.).

¶9. When determining the merits of a probation violation based on a probationer's expulsion from a court-ordered treatment program, the ultimate question for the court is whether the probationer participated satisfactorily in the program. *State v. Masse*, 164 Vt. 630, 631, 674 A.2d 1253, 1255 (1995) (mem.). Here, however, as Zito's letter of termi-

nation and his testimony at the merits hearing makes explicit, the issue of defendant's satisfactory participation is linked directly to his alleged inability to abide by the group's no-contact rules. Thus, even though the trial court did not announce a conclusion on the alleged violation of the no-contact probation condition, our analysis must heed the constitutional considerations involved in normal no-contact condition cases. See *id.* at 631-32, 674 A.2d at 1255-56 (rejecting claim that termination-from-treatment violations are reviewed for an abuse of the terminating officer's discretion, and noting specifically that trial court's decision properly avoided considering reasons for termination that might have implicated probationer's constitutional rights).

¶ 10. Defendant argues that the trial court erred in finding a violation because the State failed to show that the contact with J.N. at the Price Chopper was intentional as required by *Danaher*. In light of the evidence presented on defendant's familiarity with J.N. generally; his ability, one day later, to specifically describe her physical appearance at the Price Chopper on the previous day in spite of his claim not to have recognized her; the group's contact guidelines, the boundaries of which defendant was undisputably aware; and defendant's history of similar incidents while in the group, we hold that the trial court's findings are sufficient to support its conclusions that defendant intentionally failed to remove himself from the Price Chopper after recognizing his victim, and that his failure violated the group's no-contact policies. See *Austin*, 165 Vt. at 398, 685 A.2d at 1082 (stating that this Court will affirm findings of fact fairly supported by any credible evidence, and conclusions of law reasonably supported by the findings).

¶ 11. Based on defendant's own testimony, the court found that defendant knew that victim contact was expressly prohibited by the rules of the group as outlined broadly in the group treatment contract, as well as the probation conditions themselves. Defendant specifically "acknowledged that he's been in group with Mr. Zito and is aware of the policies within that group to have no unsupervised contact." As part of its findings on the group's policies and defendant's awareness of them, the court cited an incident that led to defendant's suspension from group treatment in 1999. Zito testified as to defendant's own recounting of the incident that involved victim contact with "Tina." Defendant acknowledged in group that he had encountered Tina at her place of employment where he was having lunch. Though he had recognized Tina, he had failed to observe the group's protocol which would have required "getting up and leaving immediately." Instead, defendant chose to remain for a period of between five and ten minutes. The court noted that he had been suspended from treatment as a result of this incident. The court also noted another more recent incident where defendant had failed to remove himself from the company of his minor daughter after realizing that she was not chaperoned as required by group rules. According to the court's findings, defendant sat next to his daughter in a church pew for approximately thirty minutes during a service before noticing that the approved supervisor, her mother, was not present. Aside from expressing doubts about the credibility of defendant's claim not to have realized that the chaperone was not present, the court noted that defendant also reengaged his daughter in conversation after the service even though he knew that the chaperone was absent at that point. Though this incident did not result in suspension, it did lead Zito to increase his supervision of defendant.

¶ 12. From these findings, the court concluded that a person who was in the

group as long as defendant, and who had been reprimanded for the contact violations described above, should have known that further similar conduct was a basis for termination from the group. Moreover, the findings delineate the group's no-contact policies. As the prior incidents demonstrated to defendant, a no-contact policy violation can occur even when the initial contact was accidental or inadvertent. Once defendant recognized his victim, or realized that he was initiating contact with a minor without required supervision, defendant had the responsibility to remove himself from the situation without delay. Thus, Zito did not punish defendant for the aspects of unapproved contact that were beyond his control; Zito sanctioned defendant only when defendant intentionally failed to avoid unapproved contact after realizing that it had been initiated. Such a policy respects defendant's due process rights as outlined in *Benson*, 172 Vt. at 4-5, 769 A.2d at 1295; and echoed in *Danaher*, 174 Vt. at 593-94, 819 A.2d at 694-95.

¶ 13. Turning to the conduct that finally precipitated defendant's termination from treatment, we affirm the conclusions of Zito and the trial court that the Price Chopper incident was another in defendant's pattern of willful violations of the group's prohibition on victim contact. The court's conclusion relies on its specific finding that defendant was not credible when he claimed that he did not recognize J.N. while he remained behind her in line at the Price Chopper. Defendant had been married to J.N.'s mother and had lived in the home where J.N. would frequently stay with her mother. In the years after his separation from J.N.'s mother, defendant had been to her home and had seen pictures of J.N. in the home, including one from her sophomore year that hangs prominently over the fireplace. The court also noted undisputed testimony that defendant had seen J.N. at her workplace when she was four-teen. Defendant made eye contact with J.N. in the Price Chopper parking lot and ended up directly behind her at a distance of about three feet in the line at the customer service desk. J.N. could see his face in the security monitor over the desk. While both defendant and J.N. were in line, J.N.'s friend had called out to her and greeted her by her first name. These findings support the court's conclusion that defendant's claim that he did not recognize J.N. at the Price Chopper was not credible.

¶ 14. Moreover, most striking to the court was the fact that, after his arrest, defendant made an entry in his group "contact log" recounting the Price Chopper incident and describing J.N. in "specific" detail, noting her relative height, hair styling, and that she was wearing sunglasses on her head. Nonetheless, defendant claims not to have recognized her. Defendant asserted that his recollection came from information given to him by the police on the day of arrest, and from having read J.N.'s statement to the police. The court rejected this claim because defendant's contact log contained more detail than was provided by both of the sources defendant allegedly relied on.

¶ 15. Defendant does not dispute this finding on credibility, but argues that it is no substitute for an express finding on defendant's intent. The main problem with defendant's argument is that it ignores a key statement made by the court moments after discounting defendant's credibility as it pertained to his version of the events at the Price Chopper. The court stated that it was "not persuaded that the conduct resulting in his termination from group *was not willful*, or the result of factors beyond his control." (Emphasis added.) As we have long recognized, the words "willful" and "intentional" are generally synonyms in the criminal law. *State v. Parenteau*, 153 Vt. 123, 125-26, 569 A.2d 477, 479 (1989).

For example, in *State v. Penn*, we approved of a jury instruction that defined willfully as "purposefully and intentionally, and not by accident, mistake or inadvertence." 2003 VT 110, ¶ 9, 176 Vt. 565, 845 A.2d 313 (mem.) (quotations omitted). Thus, the trial court did conclude that defendant engaged in willful conduct, and thereby foreclosed defendant's claim that his contact with his victim at the Price Chopper was accidental or unintentional.

¶ 16. The trial court's conclusion is well supported by the findings. As discussed, the group's no-contact policy extends beyond those situations where a group member goes to a certain place at a certain time with the specific intent to contact his victim. It also embraces those encounters that are initially accidental or inadvertent, but that become intentional once defendant realizes that he is in the presence of his victim, but fails to timely remove himself from the victim's vicinity. The trial court found that defendant continued to stand directly behind J.N. in the customer service line even though he knew that she was there and that he had an obligation to leave after recognizing her. The court further found that he waited there until she finished her business and was so close to her that he had to move out of the way so that she could pass. These findings fully support the court's conclusion that defendant intended to violate the group's prohibition on victim contact. As we noted in *Danaher*, this Court may presume that the trial court "properly inferred essential facts from its factual findings." 174 Vt. at 593, 819 A.2d at 694. This includes mixed questions like those surrounding intent, because intent is almost always inferred from subsidiary facts. *Id.* at 596, 819 A.2d at 697 (Dooley, J., dissenting).

¶ 17. The court's conclusion is not weakened by the credible evidence that defendant had an innocent purpose for being at the Price Chopper at the time, and that defendant had no reason to expect that his victim would also be there. In this case, evidence that goes to defendant's mental state prior to the point at which he found himself in the presence of his victim is substantially less important than evidence of defendant's reaction to the situation.

¶ 18. The trial court's review of defendant's history in the group confirms its conclusion that, given how long defendant had been in the group, he should have had more success in abiding by group rules prohibiting victim contact. Though defendant had shown some progress, that progress was marked by "fits and starts." Defendant's history of failing to abide by the group's no-contact guidelines, only some of which has been recounted here, retarded and often derailed defendant's treatment. As a result of this chronic failure to respect a group policy aimed at minimizing risk factors for recidivism, the trial court properly concluded that defendant has not participated satisfactorily in the group. The trial court reached this conclusion after showing proper sensitivity for defendant's constitutional rights. Therefore, the violation must be upheld. See *Masse*, 164 Vt. at 632, 674 A.2d at 1256 (upholding probation violation based on trial court's conclusion that defendant had not progressed satisfactorily in sex offender treatment).

*Affirmed.*